IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ENTERED
DEC 27 2001
U.S. DISTRICT COURT
MARTINSBURG, WV 25401

J. FRANK DEEM, ELIAS DON YOAK,
and KENNETH YUFER,

    Plaintiffs,

RICK HANDLEY, PHYLLIS ARTHUR, and
BOB BAIRD, individually and in their
official capacity as the County
Commissioners of Mason County, West
Virginia,

    Intervening Plaintiffs,

v.                                          CIVIL ACTION NO. 3:01cv75

JOSEPH MANCHIN, III, Secretary
of State of West Virginia, BOB WISE,
Governor of the State of West Virginia,
EARL RAY TOMBLIN, President of the Senate
of West Virginia, and ROBERT S. KISS,
Speaker of the House of Delegates of the
State of West Virginia, in their official
capacities,

    Defendants.

JOHN UNGER, II, JOHN OVERINGTON, ELIZABETH
BLAKE, GREGORY CORLISS, JERRY M. MAYS,
KENNETH MAYS, BILL MOORE, SHIRLEY MOORE,
CLARENCE PENNINGTON, WILLIAM C. RITCHIE,
and PHILIP SPRIGGS,

    Plaintiffs,

RICK HANDLEY, PHYLLIS ARTHUR, and
BOB BAIRD, individually and in their
official capacity as the County
Commissioners of Mason County, West
Virginia,

    Intervening Plaintiffs,

v.                                          CIVIL ACTION NO. 3:01cv78

JOSEPH MANCHIN, III, Secretary
of State of West Virginia, BOB WISE,
Governor of the State of West Virginia,
EARL RAY TOMBLIN, President of the Senate
of West Virginia, and ROBERT S. KISS,
Speaker of the House of Delegates of the
State of West Virginia, in their official
capacities,

Defendants.

Before MICHAEL, Circuit Judge, and FABER and BROADWATER, District Judges.

FABER, District Judge.

MEMORANDUM OPINION

On September 19, 2001, the West Virginia Legislature enacted House Bill 511 which redistricted both chambers of the legislature based on the United States census of 2000.  Two suits were filed challenging the constitutionality of the redistricting plan as it relates to the West Virginia Senate.  The two suits were consolidated and this three-judge court appointed to hear them pursuant to 28 U.S.C. § 2284.  Plaintiffs in the first suit include John Unger, II, a West Virginia State Senator, and John Overington, a member of the House of Delegates.  Both are residents of Berkeley County, in what is commonly referred to as West Virginia's "Eastern Panhandle."  One of the plaintiffs in the second case is J. Frank Deem, a member of the West Virginia Senate from Wood County, which borders the Ohio River in the West.  Unger is a Democrat; Deem and Overington are Republicans.  Both suits are based on the proposition that there are impermissible population variances among the districts of the State Senate under House Bill 511.  Federal jurisdiction is grounded on 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

After the two original suits were filed and consolidated,

this court permitted a third group of plaintiffs to intervene under Rule 24 of the Federal Rules of Civil Procedure. These new plaintiffs are Rick Handley, Phyllis Arthur and Bob Baird, the elected members of the County Commission of Mason County, West Virginia. Handley and Arthur are Democrats; Baird is a Republican. The three commissioners contend that House Bill 511, as it redistricted the West Virginia House of Delegates, violates the "three-fifths rule" contained in Article VI, § 6 of the West Virginia Constitution. Article VI, § 6 requires a county containing less than three-fifths of the ratio of representation for the House of Delegates to be attached to some contiguous county or counties to form a delegate district. Mason County is more populous than three-fifths of the delegate ratio, but is denied a delegate, the intervenors contend, because it is split into two districts containing other counties which are more populous. The intervenors maintain that this court has supplemental jurisdiction over their state constitutional claim under 28 U.S.C. § 1367.

The material facts are not in dispute and the cases are ripe for decision on cross-motions for summary judgment. For the reasons discussed below, we find no constitutional defect in the redistricting plan as it relates to the West Virginia Senate; we dismiss for want of jurisdiction the intervenors' attack on the plan as it relates to the House of Delegates.

I.

According to the 2000 census the population of West Virginia is 1,808,344. The State Senate comprises seventeen senatorial districts. Under ideal population equality, each district would contain 106,374 people. West Virginia's most populous county, Kanawha, is given two districts which are coterminous. These two districts, District 8 and District 17, contain 200,073 people, the total population of Kanawha County. Thus, each district has a population of 100,036.5 persons, 6,337.5 fewer persons than the ideal, a deviation of 5.96%.

Before 1965, Kanawha County had one Senate district and two Senators, causing its citizens to be grossly underrepresented in the State Senate. In 1965, Kanawha County was given four Senators in two overlapping county-wide districts. This pattern has been adhered to in every redistricting since, despite the fact that Kanawha's population has been in decline throughout the entire period. In 1970, Kanawha County had 13.16% of the state's total population, in 1980 it had 11.87%, in 1990 11.58% and in 2000 11.06%. The West Virginia Senate has 34 members; four senators are 11.76% of the total membership. Kanawha's population decline has occurred at the same time that counties in West Virginia's "Eastern Panhandle" and Putnam County, which borders Kanawha on the West, have experienced significant population growth, a trend which appears to be continuing.

Senate District 4 has the largest population of any district under House Bill 511, 111,652 persons. This exceeds the ideal population by 5,278, a deviation of 4.96%. To calculate the maximum deviation under the plan, the absolute deviation of the least populous district (District 8 or District 17) is added to the absolute deviation of the most populous district (District 4). The sum of these two numbers, 5.96 and 4.96, is 10.92. The maximum deviation under the plan is therefore 10.92%.

Under the plan the average Senate district deviates from the ideal population by 3.92%. District 15 has a population of 111,344, or 4,970 more than the ideal population. District 15's deviation is 4.67% and, when added to the deviation of District 8 or District 17, produces a maximum deviation of 10.63%. Any of six different districts, the 3rd, 4th, 11th, 14th, 15th or 16th, can be used with Kanawha County to produce a maximum deviation greater than 10%. The total population of these six districts is 668,046.

House Bill 511 divides eleven counties and twelve voting districts among different Senate districts. Such division directly contravenes Article VI, § 4 of the West Virginia Constitution which requires Senate districts to be "bounded by county lines." Beginning with the 1977 reapportionment, and in each one since, however, the legislature has found and declared that it is not possible to comply with this requirement and, at

the same time, meet the "one person - one vote" mandate of Reynolds v. Sims, 377 U.S. 533 (1964).

II.

Summary judgment is appropriate in those cases in which there is no genuine dispute of a material fact, and in which it appears that the moving party is entitled to judgment as a matter of law. See Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). Summary judgment should be granted in those cases in which it appears that no genuine issue of material fact remains unresolved and further inquiry into the facts is unnecessary to clarify the application of the law. Id. A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. Contra, Inc., 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment for a defendant is appropriate when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of

proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.

We begin our analysis by observing that there is a strong policy of deference to state legislatures in devising redistricting plans. Redistricting and reapportioning legislative bodies is a legislative task which federal courts should make every effort not to preempt. Wise v. Lipscomb, 437 U.S. 535 (1978). State policies and state preferences are for a state's elected representatives to decide; federal judges should not interfere unless those policies or preferences directly violate the United States Constitution. White v. Weiser, 412 U.S. 783 (1973).

Before 1962, state legislative redistricting issues were thought to be political questions which were nonjusticiable. See Colegrove v. Green, 328 U.S. 549 (1946). All this changed with Baker v. Carr, 369 U.S. 186 (1962), which held that the federal courts were required to take jurisdiction over a suit challenging apportionment of the Tennessee General Assembly.

Modern federal constitutional law establishing standards for state redistricting begins with Reynolds v. Sims, 377 U.S. 533 (1964). That case was a challenge to malapportionment of the Alabama legislature. Although the state constitution required a reapportionment every ten years based on population, the Alabama

districts continued to be based on the 1900 census. The court held the old apportionment to violate equal protection in view of substantial population shifts which had taken place since 1900. Equal protection, the court said, "requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." Id. at 577. The court recognized, however, that "mathematical exactness or precision is hardly a workable constitutional requirement." Id. Divergences from a strict population standard were deemed permissible if "based on legitimate considerations incident to the effectuation of a rational state policy . . . ." Id. at 579.

In Brown v. Thomson, 462 U.S. 835 (1983), the Supreme Court established some guidelines for courts to follow in examining state legislative apportionments. Under Thomson, if the maximum population deviation of a plan is less than 10%, the plan is prima facie non-discriminatory. On the other hand, if the deviation exceeds 10%, the plan is prima facie violative of equal protection. In that case, the burden shifts to the state to show that the plan "may reasonably be said to advance " consistently applied, rational and legitimate state policies. Mahan v. Howell, 410 U.S. 315, 328 (1973). The degree of disparity determines the magnitude of the state's burden. The showing required to justify population deviations is flexible -- the greater the

deviation, the heavier the burden.  See <u>Karcher v. Daggett</u>, 462 U.S. 725 (1983).  Here, the maximum deviation above 10% is slight, only 0.92%.  Stated another way, Kanawha, the county with the fewest people per Senator, has 11.06% of the state's population and 11.76% of its Senators.

House Bill 511 enumerates the policy interests the Legislature attempted to serve in the redistricting plan.  The Bill reads, in pertinent part, as follows:

> [T]he Legislature, in dividing the state into senatorial districts, as described and constituted in subsection (d) of this section has: (1) Adhered to the equality of population concept, while at the same time recognizing that from the formation of this state in the year one thousand eight hundred sixty-three, each constitution of West Virginia and the statutes enacted by the Legislature have recognized political subdivision lines and many functions, policies and programs of government have been implemented along political subdivision lines; (2) Made the senatorial districts as compact as possible, consistent with the equality of population consent; (3) Formed the senatorial districts of "contiguous territory" as that term has been construed and applied by the West Virginia supreme court of appeals; (4) Deviated from the long-established state policy, recognized in subdivision (1) above, by crossing county lines only when necessary to ensure that all senatorial districts were formed of contiguous territory or when adherence to county lines produced unacceptable population inequalities and only to the extent necessary in order to maintain contiguity of territory and to achieve acceptable equality of population; and (5) Also taken into account in crossing county lines, to the extent feasible, the community of interests of the people involved.

The policy interests thus identified in the bill are five, which may be summarized as follows: (1) Recognizing established political subdivision lines; (2) making the senatorial districts as compact as possible, consistent with equality of population; (3) forming each district of contiguous territory; (4) maintaining community of interests involved; and (5) crossing county lines only when necessary to preserve the other stated goals.

The defendants have offered several other policies to support the plan, such as preserving the core of pre-existing districts. In this case, however, we need only consider the policies specifically identified in the bill on the premise that the bill itself is the most reliable source of legislative intent. This was the procedure followed by the Supreme Court in <u>Mahan</u>, where the court had before it a similar statement of purpose in the plan under consideration there.[1]

It is obvious that the policy goals of the redistricting plan identified in House Bill 511 will not always be consistent. In some circumstances they will compete. The redistricting exercise is therefore a balancing process in which one objective must sometimes yield in order to serve another. This is an exercise peculiarly suited to the give and take of the legislative process. Courts, as a consequence, should be reluctant to substitute our judgment for the legislature's

choices.

The legislature was presented with an uncanny problem when it came to Kanawha County, a problem aggravated by a special provision of the West Virginia Constitution. Article VI, § 4 of that Constitution gives each district two Senators, but requires that, in the case of multi-county districts, the two come from different counties. Creating one district in Kanawha County of ideal size (106,374 people) would leave the balance of Kanawha's population (93,699) to be combined with another county. That other county would contribute only about 12,000 people to the combined district, but would be entitled to its own resident Senator. Avoiding such a result appears to us to be a rational legislative choice. This is particularly the case when one considers the rural nature of counties contiguous to Kanawha, such as Roane or Clay, which are small enough to contribute the correct number of people to the combined district without splitting them up. Another alternative which suggests itself may be even less desirable -- dividing Kanawha into pieces and creating several combined districts by adding the pieces to a number of adjoining counties.

Keeping Kanawha intact serves all of the Legislature's stated goals. It preserves the territorial integrity of Kanawha County, an established political subdivision; it creates two compact districts which are formed of contiguous territory; it

maintains Kanawha's community of interests, which differs substantially from the interests of adjoining counties; and, finally, the districts do not cross county lines at all. The plan serves all these goals while creating a deviation only slightly above 10%. We cannot, in light of this, say that the legislature's policy decisions were irrational.

This conclusion finds support in reported cases upholding other redistricting plans. In <u>Mahan</u>, the Supreme Court held that maintaining the integrity of traditional county and municipal boundaries in reapportionment of the Virginia House of Delegates justified a deviation of 16.4% from the ideal district size. In <u>Voinovich v. Quilter</u>, 507 U.S. 146 (1993), a district court decision disapproving Ohio reapportionment was reversed, the Supreme Court instructing the lower court to consider on remand whether a policy of preserving political subdivision boundaries justified size deviations among districts in excess of 10%. <u>Stone v. Hechler</u>, 782 F. Supp. 1116 (N.D. W.Va. 1992), concerned a challenge to a West Virginia congressional redistricting plan based on the 1990 census. In that case, this court concluded that population variances were justified in order to preserve the cores of preexisting districts and to maintain district compactness.

We recognize that, in order to pass constitutional muster, the legislative policy offered to support a deviation in

excess of 10% must be consistently applied.  Here, we have some concerns about House Bill 511, but our concerns do not compel us to invalidate the plan.  There are two or three instances in which the plan rather cavalierly violates the objective of crossing county lines only when necessary to preserve other stated goals.  For example, five voting districts of Ohio County are severed from the First Senatorial District, containing the bulk of that county, and are added to the Second Senatorial District.  The necessity for this is difficult to perceive.  Moreover, while the plan generally serves to advance the goal of community interests within each district, there are instances where this principle is also violated.  For example, the Fifteenth Senatorial District comprises the southern portion of fast growing Berkeley County as well as Pocahontas County, areas that are culturally distinct and separated by a driving distance of over 200 miles.

   Despite our concerns, we are constrained to uphold the plan.  Our inquiry is limited to whether or not <u>this</u> plan meets the constitutional requirements.  Our quest is not to find the best plan, it is to assess the constitutionality of the plan the legislature has chosen.  Here, the deviation from the ideal exceeds 10% only slightly.  The legislature has adopted five rational and legitimate policy goals to justify a deviation in excess of 10%.  In many respects these goals are competing and

must be balanced by the legislature. We cannot conclude from the facts of this case that, in this balancing process, the legislature has failed to meet the requirement that the policies be consistently applied. Accordingly, we hold that House Bill 511, as it relates to the West Virginia Senate, is constitutional.

IV.

We turn now to the intervenors' claim that House Bill 511 is invalid as it relates to reapportionment of the House of Delegates. Intervening-plaintiffs, who are Mason County Commissioners, claim that the House of Delegates portion of House Bill 511 (hereafter the "House section") violates Article VI, § 6 of the Constitution of the State of West Virginia. In their motion for summary judgment, the intervenors claim that this case is factually interrelated to the cases challenging reapportionment of the Senate.

The court must determine first whether it has jurisdiction to hear the intervenors' claim. Federal courts are empowered to hear only such cases as are within the judicial power of the United States, as defined in the Constitution, and have been entrusted them by a jurisdictional grant of Congress. The intervenors contend that this court has supplemental jurisdiction over their claim under 28 U.S.C. § 1367. Section 1367 provides that:
   in any civil action of which the district courts have

> original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The court has original jurisdiction over the Senate section because plaintiffs allege that it violates the Fourteenth Amendment to the Constitution as interpreted by the United States Supreme Court. The issue then is whether the intervenors' claim that the House section violates the West Virginia Constitution constitutes the same case or controversy as the cases of the original plaintiffs.

The test for determining whether state and federal claims form part of the same constitutional case or controversy is set forth in United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966). Pendent jurisdiction, in the sense of judicial power, exists whenever there is [a federal claim], and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues,

there is power in federal courts to hear the whole.  Accord, ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997).

In support of the factual interdependence of this petition with the original Senate complaints, the intervenors argue that: (a) the parties are identical in the two actions and (b) both parties seek to have House Bill 511 declared invalid.  The fact that the parties are identical does not by itself establish that the two cases are factually related.  Thus, the intervenors' claim must be dismissed unless the two sections of House Bill 511 have sufficient underlying similar facts.[2]

Legally, the claims are completely distinct.  The challenge to Senate redistricting is based on inequality of population under the equal protection clause of the United States Constitution.  The House complaint is based solely on a specific and unique provision of the West Virginia Constitution regarding the arrangement of counties in House of Delegates redistricting.

The only relevant facts common to both claims are the populations and boundaries of the counties of West Virginia.  However, none of these facts is in dispute.  The intervenors' challenge to the constitutionality of the House section of House Bill 511 is completely separate from the challenge to the Senate section.  The House section deals with the relative populations and boundary lines of the 100 Delegate districts.  The Senate

section deals with the relative populations and boundary lines of the 17 Senate districts. The House section does not arise out of a common nucleus of operative fact with the Senate section and challenges a different section of the statute based on entirely different legal principles. Accordingly, this court lacks subject matter jurisdiction over the petition regarding the redistricting of the House of Delegates and declines to consider the merits of the intervenors' complaint.

A separate Judgment Order will be entered consistent with this Memorandum Opinion.

---

[1] The plaintiffs in at least one of the cases have objected strenuously to an order of the court denying them the privilege of taking depositions of members of the Senate. Such depositions would probe the intentions of Senate President Tomblin and other individual Senators in an effort to identify the precise motives behind the redistricting plan. We do not view such an exercise as helpful. We take at face value the objectives of the plan as stated in the bill itself, and do not find the separate intentions of individual Senators relevant.

[2] The fact the two sections are within the same bill is of little importance. Under West Virginia's general severability statute, W. Va. Code § 2-2-10(cc), the House section does not rise

and fall with the Senate section.